Good morning, Your Honors. My name is Linda Platicia. I'm here representing the plaintiff's appellants in this action. I'm here with Mr. Vigliani and Mr. Webb, my co-counsels. And I'd like to reserve approximately four to five minutes for rebuttal. I'll try to keep an eye on this clock. It's getting late in the day here. Your Honor, we're here today to ask this Court to reverse a granting of summary judgment and a denial of class certification. We believe that the main issue in this case is whether Delta has a lawful claim to the money demands in these debit memos, because we believe that serves as the foundation of the racketeering predicates. Now, what I'd like to do here this morning is I'm going to start out with the summary judgment decision. And I just want to highlight the errors I believe the Court made. Then I'm going to specifically point the Court to just a couple of documents we believe raise as triable issues the fact that we believe will be enough to reverse that decision. I'm then going to go on and talk about the class certification motion. I left that for last because we believe that actually the district court's findings and the district court's rationale in the summary judgment motion actually highlighted the errors that it made in the class certification motion. With that, Your Honor, we believe that the district court in general erred in the summary judgment motion by usurping the role of the jury. It weighed heavily disputed evidence and basically granted summary judgment and finding as a matter of law that Delta is entitled to issue debit memos for just basically anything that it deems a violation of a very highly ambiguous contract, including but not limited to tariff violations by third-party passengers. It additionally found, notwithstanding the fact that there was absolutely no mention of damages in this contract, that Delta is entitled to the money demanded in these debit memos, again, in any amount it deemed appropriate, based exclusively on a common, highly speculative theory of damages. And that theory of damages is that Delta's only charging the travel agent what the passenger would have paid and what the travel agent should have charged. And this is a theory that, in fact, is implemented and administered by a common computer program, which is specifically designed to penalize and deter travel agents from making fare violations. That's a factual question on that. Is Delta the only airline that adheres to this ARC contract and issues debit memos? No, it's all the airlines, Your Honor. All the airlines. There's about 140, I believe, that are parties to the ARC contract. Now, specifically, Your Honors, I'd like to point to this theory of damages, because, in fact, this circuit looked at this exact same theory of damages in TWA v. the American Coupon Exchange. And the Court said, you know, this theory of damages that TWA was using is highly speculative. A customer could decide not to go on a flight, it could decide on another airline, and it specifically reversed a granting of summary judgment. And I think it found that, basically ---- But wasn't that case the one that involved the refund right after 9-11? No, Your Honor. That was a different one. No. This had ---- that had to do with coupon, frequent flyer ticket coupon brokering. So it was a little different scenario. But the main issue was that, you know, TWA said that, well, if somebody didn't have a brokered coupon, they would buy a full fare ticket. And it's the same theory of damages, and this Court rejected it. Was that a RICO case? Pardon? Was that a RICO case? No, Your Honor. It was actually interference with contract and I think it was a breach of contract. There was a couple of other issues going on in that case. And the Court ---- But here isn't the question really whether this is not whether this is an interference with contract or a breach of contract or anything like that, but whether this is a RICO, proper RICO suit. Pardon me? I'm sorry. Whether it's a proper suit under RICO. Oh, this particular case, Your Honor? Yes, absolutely. We believe it is, and let me tell you why. First of all, we believe that all of the elements, racketeering elements, are present. Delta did not challenge it in the motion to dismiss. Obviously, you know, kind of concurring that they were there. We've raised triable issues. The fact is to all of them. And we believe the thing that distinguishes this particular case from a contract case is, in fact, the pattern. Delta raised many cases that they found that they said, well, it's just a basic contract case. But, Your Honor, we have a pattern of racketeering that is, you know, exactly as the Court in Northwestern Bell said it was, that there are the same victims, the same, you know, way of doing business, it's open-ended, it's continuing, it's going to go on forever unless somebody puts a stop to it. So we believe it is exactly a RICO case, Your Honor. Now, I'm going to get back to you. Do you believe that you have a remedy under contract law? Do we believe we have a remedy under contract law? This is a problem I have with a contract, Your Honor. First of all, this contract is silent as to everything. So I could not really point specifically to something in there that might be, you know, a breach of contract. I think that there are some other problems that might arise with a breach of contract claim. I think it would be more difficult to certify a class under a breach of contract claim. I'm not saying that, no, it couldn't be a contract claim, but we just feel that it really is a racketeering action based on the predicate acts of extortion and wire and mail fraud. So, anyway, Your Honor, back to the American Coupon Exchange. We believe that the Court was absolutely correct when it said that Delta had or TWA had a plausible theory of damages, but that damages that are merely plausible cannot serve as a basis for recovery. And we believe that that's exactly what was occurring in this case. Now, Delta stated that that case, the American Coupon Exchange, was a tort case. They are claiming that their case is contract. But, Your Honor, it is black-letter law that damages that are remote, speculative, contingent, or even plausible cannot serve as a basis of recovery in either tort or contract. Now, what I'd like to do is specifically point this Court to a document, and it's at the record at 876 and 877. I need to drink some water, and I apologize. Thank you. That's much better. It talks about Delta's fair audit system. And it states specifically that the fair audit system is a part of the ---- What were the numbers again? 876 and 877. It talks about Delta's fair audit system, and that is actually a module of Delta's passenger revenue accounting system that audits fares and issues debit memos. Now, in this particular document, it talks about the general goal of debit memos, which is to penalize and deter. It doesn't just say that once. It says that several times. It specifically references the fact that unless airlines penalize travel agents, they're going to abuse fares. Now, Delta went on to discuss an example, and they said a typical example would be a $300 ticket, which they considered common at that time, and they said that the travel agent and the passenger would have paid $450, which would have generated a $150 debit memo. They said that that was also a common debit memo at the time. Delta ---- there's a couple of issues here. First of all, Delta talked about a penalization rate. At the time, Delta paid travel agents 10 percent commission, so the travel agent made $30 per ticket. It determined that a 1 to 5 penalization rate, meaning that the travel agent would have to sell five tickets to make up for one debit memo, was enough to deter, penalize, and cause a travel agent severe economic harm. Now, the most significant thing about this one document is that it specifically says a customer probably would not be willing to pay the additional amount of money, namely the $150. Now, I'm going to fast-forward this to 2002. 2002, the travel agent is paid absolutely no commissions by Delta. The average fare debit memo for a fare violation is not $150. It's $868. Now, the average ticket price is about the same. We have it in the record. It's about $286. So we're saying, Your Honor, that Delta has determined that a passenger probably would not be willing to pay an additional $150. We think for sure they're not going to pay an additional $868, and we believe that the penalization rate now, because, in fact, a travel agent is paid by the customer, usually a service fee for $20. We're now looking at a penalization rate of 1 to over 40. So we believe this has gone beyond the penalization, and it's, in fact, turned into a profit center for Delta. None of this is consistent with compensation for damages, Your Honors. We believe the district court actually understood this and highlighted it, because in her findings, in six of the undisputed facts, and I have them, they're 23, 25, 26, 35, 36 and 37, which are on the record at 1111 through 1117, Delta said that they were charged in the lowest fares. We presented evidence showing that they were the highest fares. The district court simply resolved this issue by striking lowest, and we believe that is not a position for the district court, and that's a position for the jury, Your Honor. So based on that, we believe that there was tribal issues, in fact, concerning these damages and that they should go to a jury. Next, Your Honor, the class certification motion. We believe that the district court's findings in the summary judgment. Do you, is the fact that Delta issues debit memos for manually calculated replacement fares, is that fact in dispute? I'm sorry, Your Honor, I didn't hear you. The way that the judge modified that sentence, is that in dispute? Or is that a correct statement? Yes, absolutely, because what she crossed out was lowest. I believe she crossed out lowest. She said it wasn't the lowest. No. She said it was. The applicable. Manually calculated. Right. And then I think the other record. Is that disputed? I'm just saying, is that wrong, factually? Well, factually, yes, I believe it is, because she said the ones that I looked at were where she had actually crossed out lowest or she had changed the terminology, I guess is in that particular example. See, the way I understood what she was saying is that although it wasn't the lowest, it was still not inconsistent with the agreement between the parties and not wrongful. Well, she said it was the applicable fare. Now, we had argued it was the highest fare. Certainly, if it's the highest fares in the market, you know, tribal issue, it's a penalty. If it's the lowest, well, probably, you know, it's not going to be. And so we believe that she kind of just resolved that by just saying, well, they're entitled to the applicable fare. Notwithstanding whether it was a penalty or it wasn't a penalty. What obligation does the travel agent assume to comply with all the terms and conditions of ticket issuance once they get the ticket stock in their hands? Your Honor, I will tell you how they comply, which is the only way they can comply. If a travel agent What's the obligation to comply? Strictly? They have a strict obligation to comply with every term and condition that are – that essentially amount to tariffs? Well, this is a little difficult. I think I'm going to answer it by explaining how they do comply. You have 140 airlines. They all have hundreds of thousands of fares. And they're all on computer. And they're on computer. That's exactly it, Your Honor. You hit the nail on the head, that if a travel agent puts a itinerary in the computer, the fare – the computer looks at all the fares and says, this is a valid ticket. And they hit the button, the ticket pops out, that is a valid ticket. Every obligation has been applied, you know, complied with. You don't get a ticket anymore. You get a code number. That's right. You don't even get a ticket. But it's saying that it's valid. Now, that's the case of all direct travel. They push the button, the ticket came out. And we're just not saying, Mr. Honor, if we look at the record at 207, Mr. Andreotti, Delta's declarant, says that very same thing. If it is automatically ticketed through the computer, it is a valid ticket. So that's how they comply, because otherwise – But you have to – as a condition of getting a valid ticket, you have to put in all of the facts that are necessary to the – to the qualification for that fare. For example, if you buy a ticket for somebody that's 65 or older as a senior ticket and you give it to a 10-year-old, it's not a valid ticket, right? That's correct, Your Honor. So to the extent, then, that age is a condition of a senior ticket, the agent assumes the obligation of verifying age. Now, isn't that true? Well, not necessarily, Your Honor. Let me tell you now. But if they don't validate age and then the airline figures out when they check the identification at the counter that this person is 55 instead of 65, whose fault is it, the airlines or the agent that booked the ticket? Well, I'll tell you. The – you know, passenger calls, very few people show up in a travel agency anymore. They call up and they say, I'm a senior citizen. I don't care. I just want to know if those facts are what the airline is dealing with, whose fault is it that the wrong age is put in the computer? We believe, Your Honor, that it is – that the airline catches it at the counter because they check identification. Are you agent for the airline or are you agent for the purchaser? Well, that's a question of fact, Your Honor. And that is – the district court noted – Contract with the airline. Are you an agent of the airline or are you an agent of the ticket purchaser? Well, Your Honor, we believe that years ago, travel agents were agents for the airline. But we believe now they're actually agents for the passenger because the passenger is the one that pays them. The airlines no longer pay any commission. But agency principle is a question of fact, and the district court specifically struck that because we raised evidentiary objections to that, and the district court struck it in the – in this undisputed statement of material facts. Now, is that a criminal fact or is it a contract fact? I'm sorry, Your Honor. Is it a contract fact, basically? Is it a fact interpretation of a contract? Well, we believe – Or is it evidence of criminal conduct, RICO conduct? I'm not sure I understand your question, Your Honor. We're saying that because this – When the ticket agent deliberately puts in an age differential, it's defrauding the airline, is it not? No. I don't believe – It's not? Okay. No. I don't believe that you would call – well, okay, let me say this. The travel agent may have made an error, and to be honest, maybe they're defrauding them or there's something going on like that. But the issue in this case is, can Delta then turn around and penalize that travel agent? Well, I'd hate to be the trial judge that had a class action on his hands to try to figure out what the damages are in this case. The damages, Your Honor, as far as travel agents, very easy to figure out. If Delta is found to have violated the racketeering statute, Your Honor, plaintiffs get all their money back. So that's not an issue. Now, the district court raised that issue in the class certification motion and said that, in fact, they had to look at damages. We had to look at what Delta charged, what the travel agent paid, and then do some kind of computation to determine if it was a penalty or not. Your Honor, we believe that that doesn't have to be done. First of all, Delta has already told us what a penalty is. They have said that $150 is a penalty. So we know it's somewhere under that. But we have to look at the common issues. For example, does this contract allow Delta to collect debit memos based on the acts of a third party? Justice Scalia, he didn't use his return ticket. Did his travel agent get a debit memo from Delta for $1,000? We don't know. But that is certainly Delta's position in this case. We believe that the travel agent cannot be the guarantor of a third party, the passenger, number one. And number two, we believe that Delta's computer program specifically assesses penalties. They said that's the purpose. Can they do that under the law? And the answer is no, Your Honor. They cannot. And that they don't have a contractual right to do that. They don't have a – because the contract's silent as to damages, the contract's silent as to what they can issue debit memos for. And we believe they've just gone farther than they should, and that's why this is a racketeering activity, Your Honor. I want to just briefly talk about – You have a minute before you – I only have a minute left. We got sidetracked. Your Honor, basically – Do you have any further rebuttals? Yeah, I think I will. Okay. All right. Good afternoon. Mark Weber and Carol Silverberg for Delta. Appellant's position in their papers and confirmed again today is essentially that if Delta has a contract dispute with a travel agent, that unless Delta would be entitled to summary judgment on that dispute, that then the travel agent, as a matter of law, is entitled to a jury trial on a RICO claim against Delta. And in fact, it's the exact opposite. What they've done is effectively turned this upside down or inside out. I'm not quite sure what the right analogy is, but where there's a genuine contract dispute between the parties, then the defendant's claim here, Delta's claim against the travel agent saying, we think you breached the contract, didn't do what you were on the contract issue, that, as a matter of law, that does not give rise to a RICO claim against Delta. The closest case on point, I think, is the Union National Bank case out of the Eighth Circuit, where Union National Bank and Fannie Mae got crosswise on their contract. Fannie Mae took the position that under the contract that Union National Bank was in breach and, as a result, had to buy back a package of loans. Union National Bank said that, no, it didn't. Fannie Mae said, we're going to terminate the contract for cause. And then later on, I don't know quite why it took them so long, but they figured out they had a right under the contract to terminate without cause. They said, well, you either buy back the loans or we're going to terminate because we can. The Eighth Circuit said, in affirming a summary judgment for Fannie Mae, that's not a RICO case. It's a contract case. And there, the Court even said, even though there were genuine issues of fact, whether the contract had been modified so that Fannie Mae did not even still have a right to terminate without cause, they said, that's not a RICO case. It's a contract case. And for that reason, I think in plaintiff's briefs, and especially in the reply, where they argue extensively that the contract between Delta and the travel agency is ambiguous, rather than proving why this Court should reverse, they're proving why this Court should affirm, because they're saying, by saying the contract's ambiguous, they're necessarily saying there's a legitimate, genuine contract dispute here between Delta and the travel agency when we issue these debit memos or invoices. What provision in the contract governs how much a debit memo can cover, what amount it should cover? Because I'm hearing that, or read also, that document that said it's a penalty. Is there anything in the contract that says if they issue two Saturday night tickets and it's not used in the contract, that they're entitled to the difference between that and a full first-class fare or full? Is there anything that governs any of that in the contract? The ARC agreement is silent to that, Your Honor. The way you get to the amount that we charge is the contract provides that the travel agency is required to comply with our instructions, and the instructions come in another section of the same industry agent's handbook that contains the agreement, where that has all of the requirements for ticketing and the like laid out in there. And it's also in the computers as well if they do it online. But does it describe the amount in which the debit memo will issue under various circumstances? It doesn't specify it that way. What it says is you're required to comply with our instructions. We give instructions as to what the requirements are to issue a particular type of ticket in a particular amount. So that we issue instructions that say, for example, an unrestricted ticket from Los Angeles to New York is $1,000. That's the instruction that unless there's some exception such that they're selling It really isn't an exception. They're selling a different type of ticket. If that's the ticket they sell, they're supposed to collect $1,000. And so we then issue a debit memo. We're not citing the specific provision in the contract. What we say to them is, based on the instructions and the rules and regulations for this type of fare, here's what you were supposed to charge. Here's what you did charge. We think we're entitled to the difference. But they have they argue that there's only two types of charges that issue in a debit memo, a Y or a? They're only suing on two. They're suing on two. What they're suing on is when a travel agent issues a ticket that we say should have been an unrestricted ticket, in effect. You can refund it, full refund, and you don't have to buy it in advance. They're saying that when they sell a ticket as if it were a 14-day advance purchase ticket, so it's heavily discounted, and, for example, the one that comes up the most in this case is where those tickets are supposed to be sold within 24 hours of making the reservation. You can always buy a full fare ticket. You can walk up at the airport and buy it. What we do when we audit, we say, well, wait a minute, here's a ticket where it wasn't issued within 24 hours of when the reservation was made. The only kind of ticket that you can buy like that is one of these unrestricted  you sold an unrestricted ticket, but you sold it at a heavy discount like it was a 14-day advance purchase ticket. That's what they're suing on and claiming as a penalty. If, for example, a travel agent were to sell a 21-day advance fare that's $200, but they made the reservation 14 days in advance, not 21 days in advance, we would issue a debit memo for that as well and say, wait a minute, you sold a 21-day ticket for $200. You should have sold a 14-day ticket, say, for $300. You owe us $100. They're not suing on any of those, and they're not claiming that we do not have a right to issue debit memos there. They just pick this one category of the unrestricted fares, which are the most expensive fares, and they claim those are a penalty. I'm speculating a little, but I suspect that they did that because if they were in here saying that we're charging $100 when somebody should have charged $300 instead of $200, I think they've concluded they couldn't with a straight face claim that that's a penalty, which is the key to their argument that these are extortionate or that there's something improper about the debit memos. So they're actually only challenging what I think the record shows is 25% of the debit memos we issue. We issue debit memos all the time. They're just going after a slice. And all the other airlines do the same thing? Yes. I can't say that their practices are the exact same as Delta, but they all issue debit memos. In fact, the agreement makes it clear that everyone issues debit memos. It also provides for credit memos. If a travel agent thinks they didn't get paid as much as they were supposed to, they can issue a credit memo. I think that in reviewing all the cases for today, one thing I would want to point out is that I thought Judge Goodwin in the River City case that we cite in our brief summed up our position of this appeal very nicely. It was actually the conclusion. I don't know if it's elegant, but it's short. It's two sentences. He wrote, The possibility of treble damages and attorney's fees provides a powerful incentive to plead every commercial disappointment in terms of victimization by racketeers. But epithets in the pleadings when tested by a motion for summary judgment are no substitute for facts. And that's really what's at root here, is there is virtually a complete failure of proof as to every element of the RICO claims that are pled here. For example, on the conspiracy claim under 1962D, the complaint alleged that the conspiracy was between Delta and ARC, the Airline Reporting Corporation, which is the clearinghouse. Judge Stotler dismissed that claim on a 12B6 motion to dismiss by ARC, so they got out, and that claim was held not to plead a cause of action. So what the plaintiffs did here against us was they said, well, since the judge threw out our claim you conspired with ARC, we're going to claim that you conspired with WorldSpan, which is a computerized reservation system. And in their briefs they argue we conspired with Delta Technologies, a subsidiary. Well, if you go to the record that they submit in support of the conspiracy claim, all it is is a fellow from Delta Technologies who testified that they're the techie type, the information technology people who run the computer system that audits the fares. That's it. The record is entirely that they maintain this audit system and that Delta makes the decisions about what it wants the computer system to do. That's far from sufficient agreement to an unlawful enterprise. And with respect to WorldSpan, WorldSpan is just a computer reservation system that travel agents use to book tickets. And there they cite only two documents which don't say anything about debit memos or anything about an agreement between WorldSpan. They talk about submitting information technology projects to WorldSpan. And the one document I think highlights the failure of proof here is the document they cite is dated December of 2001, yet their claim in this case is the conspiracy supposedly began back in 1997. There's just a complete failure of proof on conspiracy. And I think that the law case, which this Court decided in August or I'm sorry, I apologize, it wasn't in August. One thing I wanted to correct or point out to the Court was we cited the panel decision of the law case, it's WAGH, and I noticed in getting ready that there was a subsequent version issued after denial of rehearing. And so the correct site should always be 363F3-821. But then going on to the enterprise claim for 1962C, again, they argue AHRQ is an enterprise that orbits, which is just an online travel agency. They contend that that is an enterprise and, again, that WorldSpan is an enterprise. Yet there's no evidence submitted of any kind to indicate how any of these entities did anything relating to supposedly issuing improper debit memos. And the WAGH case, I think, is right on point to this issue because the WAGH case is a case where a company scammed people by giving them consumer protection for like $150 that they hadn't asked for, and it showed up in your Citibank bill. The plaintiffs brought a RICO claim and charged that Citibank was the enterprise. And in affirming dismissal, this Court held that it had to show something more than just that Citibank issued bills in the regular course of its business. The only other thing I want to address, I think we've briefed to death the extortion issue and the like in our papers. Scalia, I didn't intend to. That's why I was going to skip. I was going to skip right to class certification. And the only thing I wanted to say on that, again, I think we've briefed it fully. The only thing I wanted to comment on is the standard of review. The plaintiffs or appellants have argued that this Court should not give deference and use the normal abuse of discretion standard. And the argument they made was that Judge Stotler did not lay out the grounds for her decision denying class certification. And I just want to emphasize that in the record, the excerpt of record at 514 and 16 is the transcript of the hearing where she laid out on the record at the hearing why she was denying class certification and did it applying the standards to our specific case, which is exactly what this Court has said she's supposed to do. And then when the plaintiffs moved for a stay, she issued a written decision, which is also in the record, laying out why she denied class again and why she thought a stay was inappropriate. So I think whatever standard you use, the denial of class cert was appropriate, but I think that the appropriate standard should be the usual standard again, the usual abuse of discretion standard. Counsel. Oh, sorry. Jerry Grinstein, the CEO of Delta Airlines, has made repeated statements in the press that Delta is going to go into bankruptcy soon. I don't know what soon means. Is Delta in bankruptcy now? No, Your Honor. And do you know of any intention to go in the very near future? I do not, Your Honor. Would you advise the Court immediately if there's a bankruptcy filing, because we have to stay the action? We would, Your Honor. Okay. Those statements, I think, were made recently before they negotiated a new agreement with the pilots union. I think from what I've read. I think they have trouble with the mechanics, too. Trouble of balance. But I don't think there's any pressing bankruptcy planning, but we would immediately let the Court know. Thank you. Thank you, counsel. Your Honor, I just very briefly want to address a couple of things. What I think I hear counsel saying is that basically the Supreme Court in Sedema had it wrong, that contract actions cannot serve as the basis for racketeering. That is absolutely incorrect. That was a contract case. There was a dispute where one party had gone way too far and stepped over the bounds, and the allegations were very similar, that, in fact, they were invoicing, fraudulent invoices and that type of thing. So we believe the Supreme Court has, you know, looked at that already and decided that, yes, contracts can form the basis of racketeering activities. Number two, I want to talk about they'll say, oh, we issued millions of debit memos. That's absolutely correct, Your Honor. They do. And if you look at the record, page 289, the average debit memo not in this class is $103. And we submit that if the debit memos were $103 or debit memos for fare violations, or were $150 like they were 10 years ago, we would not be before this Court. But Delta has specifically designed a scheme using a computer system that automatically replaces any kind of error. And if you look at the two named plaintiffs, they didn't even make any errors with the highest fares in the market, these YB fares. And that is the scheme to defraud, Your Honor. And that's why this is a racketeering action. That's why it's not a contract action. And we contend that that's exactly what's going on here. With reference to the standard review, we believe that the district court misstated the law and came to some findings that were not supported by the record. But we believe that this particular court has stated that if the district court made a mistake, regardless of the standard review, that it will remedy it. And we believe that that's what we'd like the Court to do. Thank you, Your Honor. Thank you, counsel. Thank you both very much. The case just argued will be submitted. The Court will stand in recess for the day. All rise. The Court will be in session and adjourned.
judges: Reinhardt, Beezer, Wardlaw